**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES *ex rel*. DUSTIN SCHILLING | **UNDER SEAL** |
| Plaintiff/Relator, | Civil Action No. _____ |
| v. | |
| ALLSUP, INC. | |
| Defendant. | |

**COMPLAINT**

Plaintiff/Relator Dustin Schilling, for his complaint against Defendant Allsup Inc. ("Allsup") alleges as follows:

**INTRODUCTION**

1.      This is an action to recover damages and civil penalties on behalf of the United States (the "Government") arising from false statements and claims made or caused to be made by the Defendant in violation of the False Claims Act, 31 USC §§ 3729, *et seq*. (the "FCA").   At issue are false claims, false records, and false statements submitted by Defendant to the U.S. Social Security Administration ("SSA") in order to participate in the SSA's direct payment program for non-attorney representatives representing claimants in Social Security Disability Insurance ("SSDI") proceedings.

2.      Defendant Allsup describes itself on its website as "the nation's premier disability representation company®" and claims that it "demonstrates industry-leading results, superior customer service, secure and sophisticated information systems, and expert,

technical knowledge of Social Security and Medicare." *See* https://www.allsupinc.com/About-Us.

3. Allsup has been representing claimants in SSDI claims for over 30 years.

4. Allsup states that it employs "hundreds of professionals" working on SSDI claim representation and that is has "secured benefits for more than 225,000 people with disabilities and obtained more than $18 billion in Social Security and Medicare payments." https://www.allsupinc.com/Disability-Insurance.

5. All of Allsup's employees who represent claimants in SSDI proceedings work as non-attorneys.

6. Historically, although fees for attorney representatives could be withheld from the claimant's past due benefits by the SSA and paid directly to the attorney representing the claimant, fees for *non*-attorney representatives could not be paid directly to non-attorneys by the SSA.

7. However, in 2005, the direct payment system was temporarily extended to "eligible" non-attorney representatives.

8. In 2010, the Social Security Disability Applicants' Access to Professional Representation Act of 2010 (the "PRA") was passed by Congress, making the application of the program to eligible non-attorneys permanent.

9. The PRA authorizes the SSA to withhold 25% of a claimant's past-due SSDI benefits and directly pay any authorized fees to the claimant's eligible non-attorney representative(s) under titles II and XVI of the Act.

10.     However, to be deemed an eligible non-attorney representative, an individual must meet several requirements established by the SSA.  *See* 20 C.F.R. § 404.1717.

11.     Allsup has violated, and is continuing to violate, the FCA, regularly and repeatedly, by certifying to the SSA that it is complying with the requirements of the direct payment program—codified in the PRA, Public Law No. 111-142 and its implementing rules and regulations (the "Direct Payment Program")—when, in fact, it is not.

12.     Allsup's failure to satisfy these requirements render it ineligible to receive payments from the SSA via the Agency's Direct Payment Program.  Thus, Allsup has received, and is continuing to receive, millions of dollars in federal funds that it otherwise would not have been eligible for but for its false claims of compliance with the eligibility requirements of the Direct Payment Program.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. §3732.

14.     This Court has personal jurisdiction and venue over Allsup pursuant to 28 U.S.C. §1391(b) and 31 U.S.C. §3732(a).

15.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 (b) & (c) and 31 U.S.C. §3732(a).

16.     This case is not based on a public disclosure within the meaning of the FCA, and Schilling is the original source of the allegations contained herein.

**PARTIES**

17.     Relator Dustin J. Schilling is a former employee of Allsup and resident of Belleville, IL.

18.     Mr. Schilling is not an attorney.

19.     Mr. Schilling was employed by Allsup for 11 years.  He joined Allsup in June of 2003 and voluntarily left the company on May 30, 2014.

20.     Mr. Schilling worked out of Allsup's Belleville, IL headquarters.

21.     During his tenure with Allsup, Mr. Schilling represented hundreds of claimants in their efforts to obtain SSDI awards.  He is thus personally knowledgeable about Allsup's operations as they relate to the company's non-attorney representation of SSDI claimants and the company's false claims regarding its eligibility for the Direct Payment Program.

22.     Allsup is an Illinois corporation, headquartered in Belleville, IL.

23.     Allsup advertises itself as "the nation's premier disability representation company®" and claims that it "demonstrates industry-leading results, superior customer service, secure and sophisticated information systems, and expert, technical knowledge of Social Security and Medicare."  *See* https://www.allsupinc.com/About-Us.

24.     The United States is herein named a Plaintiff pursuant to the False Claims Act, 31 U.S.C. §3729, *et seq.*, as funds of the United States, through SSA, have been directly or indirectly disbursed and awarded to Defendant, as a result of the knowingly false claims, records and statements alleged in this Complaint made by or caused to be made by Defendant.

## FACTS

25.     Paragraphs 1 through 24 are incorporated herein by reference.

## The Social Security Disability Applicants' Access to Professional Representation Act of 2010 ("PRA")

26.     On February 27, 2010, Congress enacted the PRA, Public Law No. 111-142, which provided for an effective date of March 1, 2010.

27.     Under the PRA, the Social Security Administration is authorized to withhold 25% of a claimant's past-due benefits and directly pay any authorized fees to attorney representatives for claims filed under title XVI of the Act.

28.     The PRA also authorizes the SSA to withhold 25% of past-due benefits and directly pay any authorized fees to eligible non-attorney representatives under titles II and XVI of the Act.

29.     To be deemed an eligible non-attorney representative, an individual must meet the following requirements established by the SSA (see 20 C.F.R. § 404.1717):

(1) complete and submit an application;

(2) pay the application fee;

(3) demonstrate that he or she possesses:

> (i) a bachelor's degree from an accredited institution of higher learning; or (ii) at least four years of relevant professional experience and either a high school diploma or a General Educational Development certificate

(4) pass criminal background investigation, and attest under penalty of perjury that he or she:

> (i) has not been suspended or disqualified from practice before us and is not suspended or disbarred from the practice of law in any jurisdiction; (ii) has not had a judgment or lien assessed against him or her by a civil court for malpractice or fraud; (iii) has not had a felony

conviction; and (iv) has not misrepresented information provided on his or her application or supporting materials for the application

(5) take and pass a written examination [the Eligible for Direct Payment Non-Attorneys ("EDPNA") examination];

(6) provide proof of and maintain continuous liability insurance coverage in a prescribed amount;

(7) complete and provide proof that he or she has timely completed all prescribed continuing education courses.

30.     The EDPNA examination is usually held only once a year and is a 40 to 50 question, multiple-choice examination.  See https://secure.cpshr.us/ssa/Examination.asp.

31.     The purpose of the EDPNA exam is to "test[] [a representative's] knowledge of the relevant provisions of [the] Act and the  most recent developments in [SSA] and court decisions affecting titles II and XVI of the Act."  *Id.*

32.     The eligibility requirements were instituted after a five year demonstration project was implemented by the SSA to investigate the extension of direct payment of SSA-approved fees to certain non-attorney claimant representatives.  *See* 2 Soc. Sec. Disab. Claims Prac. & Proc. § 20:21 (2nd ed.).  The demonstration project began on February 28, 2005 extended into 2010.

33.     With the passage of the PRA, the eligibility requirements became permanent.

34.     In late 2007, about midway through the demonstration project, the GAO

conducted an evaluation of the direct fee payment program and reported the following

findings[1]:

    (1) Judges and claimants consider the performance of eligible non-attorneys to be generally on a par with that of attorneys, but judges rated ineligible non-attorneys less highly;

    (2) Judges and eligible non-attorneys were generally satisfied with the implementation of fee withholding for non-attorneys, including more of the eligibility criteria for non-attorneys. However, both groups expressed concern about the experience standard, which currently allowed non-attorneys who have represented as few as five disability claims before the SSA over a two-year period to qualify for fee withholding. Most judges and more than half of eligible non-attorneys considered this insufficient;

    (3) Fee withholding has increased the number of SSI claimants represented by attorneys but has also complicated payments in certain SSI cases, where representatives can collect more than authorized by the SSA if the representative is also paid by the state for representing claimants in successful SSI claims.

35.     Following the demonstration project, the SSA added additional eligibility

requirements to further elevate the bar for non-attorney representatives.

36.     The SSA has a significant interest in high quality representation by non-

attorney representatives and it uses the direct payment option as an incentive to expand the

ranks of better trained and more knowledgeable non-attorney representatives.

37.     In the legislative history of the PRA, Senator Baucus explained: "Claimants

of Social Security disability benefits who want to appeal decisions on their cases face many

---

[1] 2 Soc. Sec. Disab. Claims Prac. & Proc. § 21:10 (2nd ed.) (summarizing findings of GAO in its report entitled "SSA Disability representatives: Fee Payment Changes Show Promise But Eligibility Criteria and Representative Overpayments Require Further Monitoring", GAO 08-5, October, 2007).

complexities. Therefore, many wish to hire professionals to represent them in these appeals.

These representatives can request to have their fees withheld by SSA from the retroactive

benefits owed to the claimant. The withheld fees are forwarded directly to the representatives

by SSA. This fee arrangement [as outlined in the PRA] makes it much more attractive for

these representatives to take on these cases, which will provide claimants with easier access

to professionals willing to represent them before SSA."  *See* 156 Cong. Rec. S673 (daily ed.

Feb. 22, 2010) (statement of Sen. Baucus).

38.     Representative Tanner also expounded on the purpose of the PRA and its

extension of the direct payment program to non-attorneys:  "The benefit application process

can be very complicated, as many know; and this bill [the PRA] would help ensure that the

applicants can get professional representation and help when they need it. It makes

permanent an existing program to increase access to professional representation."  *See* 156

Cong. Rec. H482-6 (daily ed. Feb. 3, 2010) (statement of Rep. Tanner).

**Under The SSA's Rules and Regulations, an Appointed "Representative" Must Be The
Person Who Personally Makes the Central Decisions Related to the Case**

39.     The role and responsibilities of the person identified as the claimant's

"representative" are laid out in the SSA regulations.  *See* 20 C.F.R. § 404.1740.

40.     According to that section, the "representative" is the person who, *inter alia*,

"[a]ct[s] with reasonable promptness to obtain the information and evidence that the

claimant wants to submit in support of his or her claim, and forward[s] the same to [the SSA]

for consideration as soon as practicable […] [a]ssist[s] the claimant in complying, as soon as

practicable, with our requests for information or evidence at any stage of the administrative

decisionmaking process in his or her claim […][and] [p]rovide[s] competent representation

to a claimant[,] [...]include[ing] knowing the significant issue(s) in a claim and having a working knowledge of the applicable provisions of the Social Security Act, as amended, the regulations and the Rulings[.]" *Id.*

41.     Further, the SSA's Program Operations Manual System (POMS) details the authority of claimant representatives.

42.     According to section GN 03910.025 of POMS, a "representative may not" "sign an application on behalf of the claimant, unless the representative is otherwise a proper applicant under GN 00204.003" nor may an applicant "redelegate his/her authority to represent the claimant to anyone whom the claimant has not appointed as a representative[.]"

43.     Per that section, the representative is permitted to delegate some tasks to an unappointed assistant supervised and directed by the appointed representative only if the "appointed representative personally makes the decisions central to presenting the claimant's case before SSA." *Id.*

**The SSA Requires Direct Payment Program Participants To Certify That They Meet Eligibility Requirements**

44.     The SSA requires that claimants submit an "Appointment of Representative" form generated by the SSA.  It is SSA form SSA-1696-US.

45.     The SSA requires that claimants complete and submit an Appointment of Representative form if they chose to have either an attorney or non-attorney represent them before the SSA.

46.     The Appointment of Representative Form is set up to be signed and dated by both the claimant and his or her representative, so that SSA can be assured that a person claiming to be a "representative" has in fact been chosen as such by the claimant.

47.     The Appointment of Representative form includes provisions related to the Direct Payment program.

48.     First, the representative must certify that s/he is either: (1) an attorney; (2) a non-attorney eligible for direct payment; or (3) a non-attorney not eligible for direct payment.  The representative must sign and date that certification, declaring "under penalty of perjury that I have examined all the information on this form, and on any accompanying statements or forms, and it is true and correct to the best of my knowledge."

49.     Second, the Appointment of Representative form includes a section entitled "Fee Arrangement."

50.     The representative is required to select one of four fee arrangement options and then sign and date the section.  The first of the four fee arrangement options is: "Charging a fee and requesting direct payment of the fee from the withheld past-due benefits.  (SSA must authorize the fee unless a regulatory exception applies.)". The other options are:  charging a fee but waiving direct payment, waiving fees from the claimant because fees will be paid by a third party, or waiving fees from any source.

51.     The SSA also requires that representatives complete and submit two additional forms related to its Direct Payment Program.  They are form SSA-1695 and form SSA-1699.

52.     Form SSA-1695 is the "Identifying Information for Possible Direct Payment of Authorized Fees" form.  It requests certain identifying information about the claimant and the representative, including name, address, and social security number.

53.     Form SSA-1699 is the "Registration for Appointed Representative Services and Direct Payment" form.  This form is used when a representative initially wants to register for direct payment of fees, needs to update a prior registration, or is complying with a notice from the SSA instructing the person to complete the form.

54.     Form SSA-1699 requests identifying information about the representative and his or her employer (if applicable), as well as information about the preferred method of direct payment.

55.     In completing Form SSA 1699, the representative (if a non-attorney) must attest that he or she has been notified by the SSA that he or she is eligible for direct payment of fees.

56.     Form SSA-1699 also requires the representative to attest, *inter alia*, that "I will not knowingly make or present, or participate in making or presenting, false or misleading oral or written statements, assertions, or representations about a material fact or law concerning a matter within SSA's jurisdiction."

**Allsup's Participation in Direct Payment Program**

57.     Allsup has been representing claimants in SSDI claims for over 30 years.

58.     According to Allsup, it is the "first and largest company to provide nationwide Social Security representation services." *See* https://www.allsupinc.com/Disability-Insurance/Allsup-Expertise.

59.     About two-thirds of Allsup's business can be attributed to insurer (or other third party payor) clients and one-third to individual consumer clients.

60.     Allsup states that it employs "hundreds of professionals" working on SSDI claim representation and that is has "secured benefits for more than 225,000 people with disabilities and obtained more than $18 billion in Social Security and Medicare payments." *See* https://www.allsupinc.com/Disability-Insurance.

61.     Allsup employs dozens of non-attorney representatives to represent claimants in SSDI proceedings.  Allsup promotes the skills and success of those non-attorney representatives at length in its advertising materials.

62.     For instance, Allsup has dedicated an entire page of its website to a comparison of the skills, and results obtained, by attorney representatives (which Allsup does not employ) versus non-attorney representatives (which Allsup employs).  *See* https://www.allsupinc.com/Disability-Insurance/Compare-SSDI-Representatives.

63.     On that page, Allsup purports to debunk, or at the least explain, various claims about the benefits of hiring an attorney rather than Allsup.  *Id*.

64.     Allsup's "Claim #3" is that "Attorney fees are approved, withheld from the claimant's past due SSDI benefits and sent directly to the attorney."  *Id*.  Allsup is responding to the benefit of direct deduction of attorney's fees if a claimant hires an attorney rather than a non-attorney representative like Allsup.  In response to this "Claim #3," Allsup states:  "Allsup's fees are also approved by the SSA and clients have options in how they'd like fees to be handled. For those clients concerned about incurring a line item expense for representation fees, Allsup can withhold its fees from reimbursed overpayment dollars."  *See* https://www.allsupinc.com/Disability-Insurance/Compare-SSDI-Representatives. (emphases added).

65.     Allsup promotes itself—and, by extension, its non-attorney representatives—as a premiere source for SSDI representation expertise.

66.     Allsup assigns its non-attorney representatives to one of two groups based on the stage of the claimant's SSDI proceedings.

67.     Allsup considers there to be four stages of an SSDI proceeding, which it calls Levels 1, 2, 3 and 4.

68.     Level 1 is the Initial Application stage, where the claimant submits her initial application to the SSA and receives an initial determination as to her disability claim.

69.     If the Initial Application is denied, generally a case moves to Level 2, the Reconsideration stage.  At the Reconsideration stage, the claimant is disputing the initial rejection of her SSDI claim by, amongst other things, submitting updated documentation.

70.     If reconsideration is likewise denied, the case moves to Level 3, the Hearing Request stage.  During this stage, the claimant again updates her application and supporting materials as well as submits briefing and oral argument as to her entitlement to SSDI.

71.     If the claimant is unsuccessful at Level 3, she may appeal the denial, a Level 4 matter.

72.     Allsup's non-attorney representatives are divided into two groups:  one group works only on Level 1 and Level 2 cases and the other group works on Level 3 and Level 4 cases.

73.     The Level 1 and Level 2 non-attorney representatives are supervised by Mindy Howard, Claims Supervisor, who is, in turn, supervised by Regina Carlton, Claims Manager.  Neither Howard nor Carlton are attorneys.

74.     The Level 3 and Level 4 non-attorney representatives are supervised by Mike Laurent, Claims Supervisor, who is, in turn, supervised by David Bueltemann, Claims Manager.

75.     When Mr. Schilling first joined Allsup, he worked in an entry level administrative position.  Shortly thereafter, in January of 2004, he was promoted to a Level 1/Level 2 non-attorney representative.  He held that position for approximately 18 months and then was promoted to Level 1/Level 2 Claims Manager.

76.     In July of 2011, Mr. Schilling was again promoted to Level 3/Level 4 non-attorney representative, and held that position until he left the company in May of 2014.

77.     Allsup began participating in the Direct Payment Program in late 2011 or early 2012, after the PRA was passed and several years before Mr. Schilling departed the company.

78.     Immediately prior to leaving Allsup, Mr. Schilling's supervisor was Mike Laurent, Level 3/Level 4 Claims Supervisor.  Laurent is not an attorney.

79.     Mr. Schilling also worked with David W. Bueltemann, Level 3/Level 4 Claims Manager. Buetlemann is not an attorney.

80.     In late 2011 or early 2012, Mr. Bueltemann took, and passed, the EDPNA examination.  He also completed the other requirements necessary to receive direct payment from the SSA.

81.     From then until May of 2013, Mr. Bueltemann was the only non-attorney representative employed by Allsup—out of approximately 100 non-attorney representatives—who had taken and passed the EDPNA test.

82.     However, Mr. Bueltemann's role is managerial and supervisory—absent some rare circumstances, he has not directly represented claimants for many years.

83.     After Mr. Buetlemann passed the EDPNA examination and became eligible for direct payment, Allsup began falsely identifying Mr. Bueltemann as the purported non-attorney representative working on Allsup's Level 3 cases on the Appointment of Representative forms that it submitted to the SSA (SSA-1696-US form).

84.     However, Mr. Buetlemann was not representing any claimants on any of Allsup's Level 3 cases.

85.     Thus, Allsup certified to the SSA via the Appointment of Representative form that Mr. Bueltemann was the eligible non-attorney representative representing the claimant when, in fact, he was not.

86.     Allsup also falsely stated on its form cover letters to the SSA—sent under Mr. Buetlemann's signature—that Mr. Buetlemann was the non-attorney representative of many of Allsup's Level 3 claimant-clients.

87.     Some of Allsup's Level 3 cases proceeded to the hearing stage.  For many of those cases, Mr. Buetlemann could not be identified, falsely, as the non-attorney representative on the Appointment of Representative forms and Allsup letters submitted to the SSA because Mr. Buetlemann, who did not actually represent the claimants and thus was not familiar with their matters, could not represent them at an oral hearing.

88.     Thus, in late 2012, Allsup informed its Level 3/Level 4 non-attorney representatives—including Mr. Schilling—that they would be taking the EDPNA examination the following year.

89.     In May of 2013, approximately 30 Level 3/Level 4 non-attorney representatives took the EDPNA examination, including Mr. Schilling.  Of those 30 people, three failed, and the rest passed.

90.     Mr. Schilling passed the exam, obtaining a score of 98 percent—the highest in the company.

91.     In addition to the Level 3/Level 4 non-attorney representatives who took the EDPNA examination in May of 2013, Regina Carlton (also known as Regina Schottel), Mike Laurent, and Mindy Howard also took the EDPNA examination.  All three passed.

92.     Neither Ms. Carlton, Mr. Laurent, nor Ms. Howard was actually representing claimants at that time.  Rather, they were all in supervisory and/or managerial roles.

93.     None of the actual Level 1/Level 2 non-attorney representatives took the EDPNA examination.

94.     Allsup instructed Ms. Carlton, Mr. Laurent, and Ms. Howard to take the exam so that it could begin identifying each of them on the Appointment of Representative forms submitted to the SSA, falsely, as the eligible non-attorney representatives working on Allsup's Level 1 and Level 2 caseload.

95.     Thus, after May of 2013, Allsup began falsely certifying to the SSA (via its Appointment of Representative form submissions and accompanying cover letters) that one of four possible people—Mr. Bueltemann, Ms. Carlton, Ms. Howard, or Mr. Laurent—was the eligible non-attorney representative working on its Level 1 and Level 2 cases.

**Allsup's Electronic Client-Claimant Databases Reveal Its Fraud**

96.     Allsup maintains a comprehensive database used by its employees, including its non-attorney representatives and Mr. Schilling, to manage and track pending and closed SSDI claims.  That case management system is used on a daily basis and includes a file for each claimant.

97.     Pursuant to Allsup policy, all communications with the claimant, as well as tasks completed on the file, are to be logged in the system.   This log begins at the time that the file is opened and continues until it is closed.

98.     Users can view and download a "Benefit Information Center" ("BIC") Talk Sheet which is a log of all of the notes that have been entered into the file, including the date of each note, the initials of the person who entered the note, and a comment or description of the communication and/or task.

99.     The BIC Talk Sheet is a comprehensive log of a description of all of the work completed on the file and who completed it.  The BIC Talk Sheet reveals the identity of the person or persons who are actually doing the day-to-day work and management of the file.

100.     In addition to its Case Management System, Allsup also maintains a Production Time Management System.  This electronic database system is organized by claimant file and covers all of Allsup's SSDI claimants.

101.     The Production Time Management System tracks who electronically accesses each claimant file (by username) and the date and time each visit began and ended.

102.     Visits to a claimant file are recorded in this system even if the user does not record a specific task, make an entry into the database, or into the Case Management System log discussed above.

103.     The Production Time Management System tracks user visits to each file—include the length of the visit—even if the user is merely reviewing the file but not taking any new action or completing any specific task.

104.     Mssrs. Buetlemann and Laurent, as well as Ms.  Howard and Ms. Carlton, never accessed—even for the purpose of review—the files of the great majority of SSDI claimants that they were falsely telling the SSA that they represented.  This fact can be confirmed via Allsup's own electronic records, including the Case Management System and Production Time Management System.

**The Falsified Documents Allsup Provides To Its Client-Claimants**

105.     When Allsup is initially retained by a claimant, Allsup provides the claimant with a package of materials necessary to begin work on the matter.  One of the documents provided is the Appointment of Representative Form, SSA-1696.

106.     In the packet of information provided to new Allsup clients, the Appointment of Representative form is provided mostly blank.

107.     Allsup pre-populates some, but not all, of the fields electronically.  For instance, Allsup pre-populates the claimant's name and Social Security Number at the top of the page.  It also pre-populates Allsup's name and address as the "person" to be appointed and authorizes the SSA to release information about the pending claims to Allsup.

108.    Allsup also pre-populates the box indicated that the representative is a "non-attorney eligible for direct payment under SSA law."

109.    Further, for its individual consumer clients, Allsup pre-populates the fee arrangement option as "charging a fee and requesting direct payment of the fee from withheld past-due benefits."

110.    But when the partially completed Appointment of Representative form is delivered to new claimants, the specific non-attorney representative assigned to the matter is not listed on the document, nor is the document signed by an Allsup non-attorney representative.   Thus, Allsup presents this form to each of its client-claimants *without* any indication of who will actually be the representative for that client-claimant's matter.

111.    Allsup provides new claimants with instructions about how to complete the Appointment of Representative form.  Allsup instructs new claimants to sign in the required box in Part I of the form, but specifically tells new claimants not to date the form.

112.    This is because Allsup often changes the specific non-attorney representative assigned to the matter and because it facilitates Allsup's ability to falsify the information provided on the form.  When Allsup changes the representative working on a claimant's file, or when Allsup falsely identifies the representative as one of its few direct-payment-eligible employees, it does not obtain a new Appointment of Representative form from the client. Rather, it simply completes one of the undated forms previously obtained from the client, and send that completed form to SSA without the client ever seeing it.

113.    Thus, at the time that a new claimant receives and signs the form, he or she does not know who his or her specific Allsup non-attorney representative will be.  Because

that portion of the form is blank at the time that the claimant signs it, the claimant has not actually authorized the person ultimately identified as the non-attorney representative to represent him or her.

114.    Allsup pre-selects the eligible non-attorney and direct payment fee arrangement options on the Appointment of Representative form, even though—at the time that the form is provided to the claimant—it has not yet decided which representative will be assigned to the matter, and even though the vast majority of its representatives are not "eligible" for direct payment.

115.    Thus, even though Allsup has already checked the box for direct payment-eligible non-attorneys, Allsup does not know that the person who will be assigned is, in fact, so eligible.  This is direct evidence that Allsup intends, at the outset of its relationship with each of its clients, to commit fraud on the SSA.

116.    Sometime after the signed form is sent back to Allsup by the claimant, Allsup completes the remaining fields, including the boxes for the representative's signatures.

117.    The representative's signatures are inputted electronically rather than handwritten and are not personally inputted by the representative.

118.    Many of the representatives never even see this form for many of the claimants that they purportedly represent, let alone physically sign it (electronically or otherwise).

119.    In rare circumstances, a claimant will object to signing an Appointment of Representative form that is largely blank and does not identify the specific non-attorney

representative to be appointed.  In those instances, Allsup will input the name of the non-attorney representative at the claimant's request prior to obtaining the claimant's signature.

120.    Allsup also sends each new client a Fee Agreement between Allsup and the client. Both the client and the Allsup representative assigned to the matter are required to sign the Fee Agreement.

121.    Allsup sends a blank Fee Agreement to the client, usually before any representative has been assigned and, as with the Appointment of Representative form, requests that the client sign the form but not date it.

122.    Allsup makes copies of the undated form before it is countersigned by Allsup and adds a date for the client's signature later.

123.    Allsup often later creates a new agreement using the undated copies without alerting the client.

**<u>The False Claims Allsup Provides To The SSA</u>**

124.    When Allsup eventually completes and submits a client's SSDI claim to the SSA, it sends a standard cover letter to the SSA.

125.    Allsup has a template for this letter and includes a nearly identical letter with every claim it submits.

126.    The letter is sent over the signature of the Allsup employee purporting to be the claimant's representative—the same person who is eventually added to the Assignment of Representative form by Allsup.

127.    In the cover letter, the Allsup non-attorney representative falsely states that he or she is the claimant representative handling the matter.  Along with the cover letter, the representative encloses the doctored Appointment of Representative form.

128.    At the time that Allsup submits the claim to the SSA—including the doctored Appointment of Representative form—the claimant does not know who has been identified to the SSA as the non-attorney representative working on the claimant's case.  Thus, although the doctored Appointment of Representative form provided to the SSA shows that the claimant has appointed a specific individual to act as his or her representative, in reality the claimant has no idea that that specific person has been named in the form.

129.    Until May of 2013, the only Allsup non-attorney representative employee that was eligible for direct payment was David Buetlemann.  Thus, Allsup sent numerous submissions to the SSA wherein it certified (via the SSA-1696 "Appointment of Representative form and related cover letter) that Mr. Bueltemann was the direct-payment-eligible non-attorney representative handling the claimant's matter.

130.    However, Mr. Bueltemann did not, in fact, represent those clients.  Mr. Buetlemann's role was solely supervisory.  He did not communicate with clients, or even touch their files, and did not otherwise represent those clients.

131.    After May of 2013 (when three additional managerial/supervisory employees—Ms. Carlton, Mr. Laurent, and Ms. Howard—passed the EDPNA examination and became eligible for direct payment), Allsup falsely claimed that they were representing many of its Level 1 and Level 2 claimants and, consequently, received direct payments from

the SSA for that work.  Yet, neither Ms. Carlton, nor Mr. Laurent, nor Ms. Howard ever

worked on the claimant's files or otherwise represented those claimants.

132.    Allsup's false statements and false certifications to the SSA—via the

submission of its Appointment of Representative forms and accompanying cover letters—

were material to the SSA's decision to make direct payments to Allsup via its Direct

Payment Program.

133.    Allsup's false statements and false certifications had a natural tendency to

influence, or were capable of influencing, the SSA's payment of money to Allsup via the

Direct Payment Program.

134.    The following examples of Appointment of Representative forms illustrate

Allsup's false claims:

> a.   On February 11, 2013, Allsup submitted an Appointment of
>
> Representative form for claimant T.L.[2]  On that form, Allsup falsely
>
> certified (via the stamped signature of David Bueltemann) that Mr.
>
> Bueltemann was the eligible non-attorney representative representing
>
> T.L.  Allsup requested direct payment of its fee from withheld past-
>
> due benefits and, on or about November 25, 2013, Allsup received
>
> direct payment of its fee from the SSA based on its false claim.

---

[2] Relator has abbreviated the names of the claimants identified in these examples due
to privacy concerns.  However, Relator can provide this information confidentially if it is
requested by Defendant or the Court.

     b.   On January 22, 2013, Allsup submitted an Appointment of Representative form for claimant I.S.  On that form, Allsup falsely certified (via the stamped signature of David Bueltemann) that Mr. Bueltemann was the eligible non-attorney representative representing I.S.  Allsup requested direct payment of its fee from withheld past-due benefits and, on or about August 4, 2013,  Allsup received direct payment of its fee from the SSA based on its false claim.

     c.   On December 20, 2013, Allsup submitted an Appointment of Representative form for claimant R.G.  On that form, Allsup falsely certified (via the stamped signature of Mindy Howard) that Ms. Howard was the eligible non-attorney representative representing R.G.  Allsup requested direct payment of its fee from withheld past-due benefits and, on or about February 21, 2014, Allsup received direct payment of its fee from the SSA based on its false claim.

135.    Allsup can identify all of the false claims that it has submitted to the SSA based on a review of its Case Management database, Production Time Management database, and claimant files.

136.    Specifically, Allsup's Case Management and Production Time Management databases show who is actually completing the work on a case, including making the central decisions in a case and/or reviewing or supervising the work of others. In other words, the Allsup employee who is "representing" the claimant.  Those records may be cross-

referenced with the Appointment of Representative form in the claimant's file that was submitted to the SSA.

137.    The vast majority, if not all, of the Appointment of Representative forms submitted to SSA that identified Mr. Bueltemann, Ms. Carlton, Mr. Laurent, or Ms. Howard as the claimant's representative were false.

**Allsup Knew—or Should Have Known—That it Must Comply with the Eligibility Requirements of the Direct Payment Program and that its Claims to the Government were False**

138.    Since at least 2012, Allsup has regularly and repeatedly lied to the SSA about the non-attorney representatives assigned to its claimants and, by extension, its eligibility for direct payment.  Allsup told the SSA that many of its clients were represented by a handful of eligible non-attorney representatives when, in fact, the Allsup employees actually doing the requisite work for the claimants were ineligible representatives.

139.    Allsup did this with knowledge or reckless disregard for the fact that it was required to list as the non-attorney representative the actual Allsup employee who was completing the work on the file and making the central decisions related to the case.

140.    Allsup knew or should have known that the falsely identified employees— Mr. Buetlemann, Mr. Laurent, Ms. Howard, and Ms. Carlton—were not even working on the claimant's files, let alone fulfilling these duties.

141.    None of the employees—Mr. Buetlemann, Mr. Laurent, Ms. Howard, and Ms. Carlton—falsely identified by Allsup as purported non-attorney representatives were ever "making the decisions central to presenting the claimant's case before SSA."

142.    That Allsup knew it was acting fraudulently is demonstrated by its decision to only submit false claims as it related to certain lines of its business and with the specific goal of obtaining direct payment of its largest fees.

143.    Mr. Schilling worked on cases in both lines of Allsup's business—namely, cases in which Allsup's client was an individual consumer and cases in which Allsup's client was a third party payor (such as an insurance company).  Mr. Schilling observed that Allsup did not lie about the identity of the non-attorney representatives representing the claimants whose fees were being paid by third-party insurers.  Because Allsup was getting paid by the insurance company rather than the individual consumer, Allsup did not bear the same collection risk.  Third party payors, including insurance companies, generally paid the fees owed to Allsup promptly, obviating any need to obtain direct payment from the SSA.

144.    Further, although Allsup did not initially lie on its SSA submissions related to its Level 1 and Level 2 claimant files, Allsup started to submit false claims related to those files in May of 2013, after Allsup had to write off approximately $1.8 million in unpaid fees by individual consumer claimants.  Allsup expanded its fraudulent conduct to Level 1 and Level 2 claims in order to minimize its collection risk related to those cases as well as to reduce its expenses associated with collection.

145.    Moreover, given the clear language of the regulations and guidance provided by SSA, even if Allsup did not actually know it was acting fraudulently, it should have known that falsifying the identity of representatives on the Appointment of Representative forms and related documents was fraudulent.

## <u>COUNT ONE: 31 U.S.C. §3729(a)(1)(A)</u>

146.    Paragraphs 1-145 are incorporated herein.

147.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to officers or employees of the United States Government.

148.    As a result of these false or fraudulent claims, the United States Government suffered damages.

## <u>COUNT TWO:  31 U.S.C. §3729(a)(1)(B)</u>

149.    Paragraphs 1-148 are incorporated herein.

150.    Defendant knowingly made, used, or caused to be made or used, false records and statements material to the United States Government's payment of false or fraudulent claims.

151.    The false records and statements included, but may not be limited to, the representations made in Defendant's false certifications and other false statements to the Social Security Administration and its agents, through explicit and implicit certifications of compliance with federal regulations, statutes, and program instructions in order to get paid by the United States government.

152.    As a result of these false records or statements, the United States Government suffered damages.

## <u>PRAYER</u>

WHEREFORE, Plaintiff prays for the following relief:

1.    A permanent injunction requiring Defendant to cease and desist from violating the federal False Claims Act;

2.     Judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained as a result of the Defendant's unlawful conduct;

3.     Civil monetary penalties for each false and fraudulent claim submitted to the United States by Defendant;

4.     An award to Relator pursuant to 31 U.S.C. §3730(d);

5.     An award of reasonable attorneys' fees, costs, and expenses;

6.     Such other relief as the Court deems just and equitable.

## JURY DEMAND

Relator hereby demands a jury trial on all issues triable to a jury.

Respectfully submitted,

JONATHAN K. TYCKO
ANDREA R. GOLD
TYCKO & ZAVAREEI LLP
2000 L Street, N.W., Suite 808
Washington, DC 20036
(202) 973-0900
(202) 973-0950 (fax)
jtycko@tzlegal.com
agold@tzlegal.com

*For Relator Dustin Schilling*